customers can buy one currency and simultaneously sell another. Both Niv and Ahdout were CFTC registrants during the relevant period.

FXCM, under Niv's and Ahdout's direction and control, misrepresented to its retail forex customers that when they traded forex on FXCM's No Dealing Desk platform, FXCM would have no conflict of interest, the Order finds. In addition, according to FXCM's marketing campaign, retail customers' profits or losses would have no impact on FXCM's bottom line, because FXCM's role in the customers' trades was merely that of a credit intermediary, the Order finds. FXCM further represented that the risk would be borne by banks and other independent "market makers" that provided liquidity to the platform, according to the Order.

**FXCM's Undisclosed Interest**

Contrary to these representations, the Order finds, FXCM had an undisclosed interest in the market maker that consistently "won" the largest share of FXCM's trading volume – and thus was taking positions opposite FXCM's retail customers. FXCM, the Order finds, formulated a plan in 2009 to create an algorithmic trading system, using an FXCM computer program that could make markets to FXCM's customers, and thereby either replace or compete with the independent market makers on FXCM's "No Dealing Desk" platform. Although FXCM eventually spun off the algorithmic trading system as a new company, in actuality the company remained closely aligned with FXCM, according to the Order. This market maker received special trading privileges, benefitted from a nointerest loan provided by FXCM, worked out of FXCM's offices, and used FXCM employees to conduct its business, the Order further finds.

The Order finds that FXCM and the market maker agreed that the market maker would rebate to FXCM approximately 70 percent of its revenue from trading on FXCM's retail forex platform. In total, through monthly payments from 2010 through 2014, the company rebated to FXCM approximately $77 million of the revenue it achieved. However, FXCM did not disclose to customers, among other things, that this company – FXCM's principal market maker – was a startup firm spun off from FXCM, the Order further finds.

**False Statements to the NFA**

*The Order also finds that FXCM willfully made false statements to NFA in order to conceal FXCM's role in the creation of its principal market maker as well as the fact that the market maker's owner had been an FXCM employee and managing director. The Order finds that during a meeting between NFA compliance staff and FXCM executives, Niv omitted to mention to NFA the details of FXCM's relationship with the market maker.*

The Order holds Niv and Ahdout liable for FXCM's fraud violations as "controlling persons" who were responsible, directly or indirectly, for FXCM's violations. Niv

is also held liable for FXCM's false statements to NFA as a controlling person who was responsible directly or indirectly for those violations. FXCM Holdings is held liable for FXCM's fraud and false statement violations as principal of FXCM, the Order also finds.[7]

9. On February 6, 2017, the Company issued a press release announcing that the Company had reached a settlement with the NFA and CFTC, pursuant to which the Company was fined $7 million and agreed to withdraw from business in the United States. In connection with the Company withdrawing from business in the United States, the Company signed a non-binding letter of intent with GAIN Capital Holdings, Inc. ("GAIN") under which GAIN would purchase the Company's U.S. customer accounts.

10. On this news, Global Brokerage's stock price fell $3.40 per share, from a close of $6.85 on February 6, 2017 to close at $3.45 on February 7, 2017, a loss of approximately 50%, on extremely heavy volume of 1,980,000 shares.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the claims asserted herein under 28 U.S.C. §1331 because the claims arise under and pursuant to §14(a) of the Exchange Act (15 U.S.C. §78n(a)) and Rule 14a-9 promulgated there under (17 C.F.R. §240.14a-9).

12. Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction. Also, the Company's principal executive offices are located in this District.

## THE PARTIES

---

[7] All emphasis added unless otherwise noted.

13. Plaintiff is, and was, a shareholder of the Company during the time defendants were violating the federal securities laws. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

14. Nominal Defendant Global Brokerage is a Delaware corporation with its principal executive offices located at 55 Water Street, Floor 50, New York, NY 10041.

15. Defendant David Sakhai ("Sakhai") co-founded FXCM, the predecessor to Global Brokerage, has been a director of the Company since 2010 and has been the Chief Operating Officer ("COO") of the Company since 1999. Defendants Sakhai and Ahdout are cousins. As COO of the Company for the fiscal years ended December 31, 2015, 2014 and 2013, defendant Sakhai received $2,102,548, $821,323 and $1,481,556 in total compensation, respectively. Defendant Sakhai oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2012-2016 Proxy Statements.

16. Defendant James G. Brown ("Brown") has been a director of the Company since 2010 and is a member of the Audit, Compensation and Corporate Governance and Nominating Committees. Defendant Brown oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2012-2016 Proxy Statements.

17. Defendant Robin Davis ("Davis") has been a director of the Company since 2010 and is a member of the Audit Committee. Defendant Davis oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2012-2016 Proxy Statements.

18. Defendant Kenneth Grossman ("Grossman") co-founded FXCM, the predecessor to Global Brokerage, and has been a director of the Company since 2010. Defendant Grossman

oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2012-2016 Proxy Statements.

19. Defendant Arthur Gruen ("Gruen") has been a director of the Company since 2010 and is the Chair of the Audit Committee and a member of the Compensation Committee. Defendant Gruen oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2012-2016 Proxy Statements.

20. Defendant Eric LeGoff ("LeGoff") has been a director of the Company since 2010. Defendant LeGoff oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2012-2016 Proxy Statements.

21. Defendant Bryan I. Reyhani ("Reyhani") has been a director of the Company since February 2016 and is a member of the Corporate Governance and Nominating Committee. Defendant Reyhani oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2012-2016 Proxy Statements.

22. Defendant Ryan Silverman ("Silverman") has been a director of the Company since 2010 and is the Chair of the Corporate Governance and Nominating Committee and the Chair of the Compensation Committee. Defendant Silverman oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2012-2016 Proxy Statements.

23. Defendant Eduard Yusupov ("Yusupov") co-founded FXCM, the predecessor to Global Brokerage, and has been a director of the Company since 2010. Defendant Yusupov oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2012-2016 Proxy Statements.

24. Defendants Sakhai, Brown, Davis, Grossman, Gruen, LeGoff, Reyhani, Silverman

and Yusupov are collectively referred to herein as the "Director Defendants."

25. Defendant William Ahdout ("Ahdout") co-founded FXCM, the predecessor to Global Brokerage, and was a director of the Company from 2010 until his resignation on February 21, 2017. Defendants Sakhai and Ahdout are cousins. Defendant Ahdout oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2012-2016 Proxy Statements.

26. Defendant Dror Niv ("Niv") co-founded FXCM, the predecessor to Global Brokerage, was a member and Chairman of the Board from 2010 until his resignation on February 21, 2017. Defendant Niv has also been the Chief Executive Officer ("CEO") of the Company since 1999 until his announced resignation on February 21, 2017, which will become effective upon the appointment of his successor. Defendant Niv is the sibling of Ornit Niv, the CEO of Forex Capital Markets LLC. As CEO of the Company for the fiscal years ended December 31, 2015, 2014 and 2013, defendant Niv received $2,102,548, $821,276 and $1,481,593 in total compensation,[8] respectively. Defendant Niv oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2012-2016 Proxy Statements.

27. Defendant Robert Lande ("Lande") joined the Company in January 2010 and was the Chief Financial Officer ("CFO") of the Company throughout the Relevant Period. Defendant Lande oversaw and signed or authorized the signing of the materially misleading financial statements described herein and referenced in the 2012-2016 Proxy Statements.

28. The Director Defendants and defendants Ahdout, Niv and Lande are collectively

---

[8] "Total compensation" includes salary, bonus, stock and option awards, non-equity incentive plan compensation and all other compensation.

referred to herein as the "defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

29.     The Company was formerly known as FXCM Inc. ("FXCM") and was founded in 1999. Until approximately 2007, FXCM provided liquidity to its retail forex customers primarily through an internal dealing desk – a division of the Company that determined the prices offered to customers and held positions opposite customers.

30.     In or around 2007, the Company transitioned from utilizing a dealing desk to transact with customers to using an "agency" model, or "no dealing desk," for its retail forex customers. As such, the Company claimed that it was no longer acting as a market maker and that the agency model eliminated the major conflict of interest between broker and retail customers.[9]

31.     In the Company's agency model, price quotations were provided not by the Company's internal dealing desk, but by banks and other third-party market makers (also known as "liquidity providers."

32.     In the Company's registration statement and prospectus for its initial public offering on December 1, 2010, the Company explained its agency model to its customers and potential investors as follows: "When our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker."

33.     The Company claimed that trading on its agency model was different from a dealing

---

[9] Andrew Saks-McLeod, *FXCM and CEO Drew Niv banned from US: Full details of FXCM's several years of trading against customers*, FinanceFeeds (Feb. 7, 2017), *available at* http://financefeeds.com/fxcm-and-ceo-drew-niv-banned-from-us-full-details-of-fxcms-several-years-of-trading-against-customers/.