desk broker because the Company would earn fees and commissions by adding a markup to the price provided by the forex market makers and generate trading revenues based on the volume of transactions, not trading profits or losses.

34. In 2009, defendants formulated a plan to create an algorithmic trading system in order to develop a computer program that could make markets to the Company's customers and thereby either replace or compete with the independent market makers on the Company's no dealing desk platform.[10]

35. Defendants Niv and Ahdout then hired a high-frequency trader, John Dittami ("Dittami"), to be a Managing Director at the Company. The employment agreement with Dittami called for the Company to pay him a base salary plus a bonus of 30% of trading profits generated by his algorithmic trading system, with the Company keeping the remaining 70%. Dittami began working for the Company in October 2009 and developed the algorithmic trading system for the Company.[11]

36. In early 2010, the Company's compliance department raised concerns that trading against the Company's retail customers might contradict the Company's marketing statements about its no dealing desk model, or the agency model the Company claimed it was operating under.[12]

37. To get around this, the Company had Dittami set up his own company and operate as an "external" liquidity provider for the Company, which was formed on or about March 23, 2010, under the name Effex Capital.[13]

---

[10] See Golovtchenko, *supra* note 6; Saks-McLeod, *supra* note 9.
[11] See Golovtchenko, *supra* note 6; Saks-McLeod, *supra* note 9.
[12] See Golovtchenko, *supra* note 6; Saks-McLeod, *supra* note 9.
[13] See Golovtchenko, *supra* note 6; Saks-McLeod, *supra* note 9.

38. On April 14, 2010, Dittami purportedly resigned from the Company, with the resignation agreement leaving the economic relationship in place whereby Dittami would retain 30% of the algorithmic trading profits and the Company receiving the residual 70%. To that end, the Company and Effex Capital entered into a March 1, 2010 services agreement, and subsequent May 1, 2010 agreement, where Effex Capital would make monthly payments to the Company in the amount of $21 per million dollars of trading volume executed by Effex Capital.[14]

39. In total, through Effex Capital's monthly payments from 2010 through 2014, Effex Capital rebated to the Company approximately $77 million of the trading revenue Effex Capital achieved.[15]

40. FXCM changed its name to Global Brokerage on February 21, 2017, with the name change becoming effective on February 27, 2017. Global Brokerage is a holding company with its sole asset being a 50.1% controlling equity interest in FXCM Holdings, LLC ("FXCM Holdings"), in which Global Brokerage is the sole managing member. The Company's wholly owned U.S. subsidiary is Forex Capital Markets LLC ("FXCM LLC").

**Defendants Cause the Company to Issue Materially False and Misleading Statements and/or Omit Material Information in the Company's Financial Statements**

41. During the Relevant Period, the Company represented to its retail customers that the Company's "no dealing desk" platform meant that the Company had no conflict of interest, or no adverse position, to those taken by Global Brokerage's retail customers. Further, Global Brokerage represented to customers that their profits or losses would be irrelevant to the Company's bottom line because the Company's role in the customers' trades was merely as a credit intermediary, and not as a liquidity provider. As such, Global Brokerage represented that

---

[14] See Golovtchenko, *supra* note 6; Saks-McLeod, *supra* note 9.
[15] See Golovtchenko, *supra* note 6; Saks-McLeod, *supra* note 9.

14

the risk would be borne by banks and other independent "market markers" that provided liquidity to trades made using the Company's platform. However, these representations were false as the Company failed to disclose that its principal market maker, Effex Capital, was a startup firm spun off from the Company and led by a former Global Brokerage employee, John Dittami ("Dittami").

42. The Company also failed to disclose and/or mispresented that Effex Capital, in which the Company had a significant interest via the March 1, 2010 services agreement and subsequent May 1, 2010 agreement, was the market maker that consistently "won" the largest share of Global Brokerage's trading volume, and thus was taking positions opposite Global Brokerage's retail customers. Effex Capital not only took positions opposite of the Company's retail customers, but also operated for the first year of its existence out of the Company's offices, and shared the majority of its trading profits with the Company.

43. On March 15, 2012, the Company filed its an annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2011 (the "2011 10-K"). The 2011 10-K stated, in pertinent part:

> ***Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers***, reduces our risks and provides distinct advantages over the principal model used by the majority of retail FX brokers. In the principal model, the retail FX broker sets the price it presents to the customer and may maintain its trading position if it believes the price may move in its favor and against the customer. We believe this creates an inherent conflict between the interests of the customer and those of the principal model broker. Principal model brokers' revenues typically consist primarily of trading gains or losses and are more affected by market volatility than those of brokers utilizing the agency model.

44. The 2011 10-K was signed by the Director Defendants and defendants Niv and Ahdout. The 2011 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Niv and Lande, stating that the financial information contained therein was accurate and disclosed any material changes to the Company's internal control over

financial reporting.

45.    On May 10, 2012, the Company filed its quarterly report on Form 10-Q with the SEC ("Q1 2012 10-Q"), announcing the Company's financial and operating results for the first quarter of 2012. The Company reported net income of $2.89 million, or $1.60 per diluted share, on revenue of $102.32 million, compared to net income of $2.80 million, or $1.60 per diluted share, on revenue of $94.58 million for the same period the prior year. The Q1 2012 10-Q stated, in pertinent part:

> *The Company utilizes what is referred to as an agency execution or agency model. Under the agency model, when a customer executes a trade on the price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. This agency model has the effect of automatically hedging the Company's positions and eliminating market risk exposure.*

46.    The Q1 2012 10-Q was signed by defendants Niv and Lande contained certifications pursuant to SOX by defendants Niv and Lande, which stated that the financial information contained in the Q1 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

47.    On August 9, 2012, the Company filed its quarterly report on Form 10-Q with the SEC ("Q2 2012 10-Q"), announcing the Company's financial and operating results for the second quarter of 2012. The Company reported a net loss of $1.44 million, or $0.60 per diluted share, on revenue of $91.41 million, compared to net income of $3.32 million, or $1.90 per diluted share, on revenue of $103.34 million for the same period the prior year. The Q2 2012 10-Q stated, in pertinent part:

> *The Company's primary offering to retail customers is what is referred to as agency execution or an agency model. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits or*

*losses.* Under the agency model, when a customer executes a trade on the price quotation presented by the FX market maker, *the Company acts as a credit intermediary, or a riskless principal*, simultaneously entering into a trade with the customer and the FX market maker. This agency model has the effect of automatically hedging the Company's positions and eliminating market risk exposure.

48. The Q2 2012 10-Q was signed by defendants Niv and Lande and contained certifications pursuant to SOX by defendants Niv and Lande, which stated that the financial information contained in the Q2 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49. On November 9, 2012, the Company filed its quarterly report on Form 10-Q with the SEC ("Q3 2012 10-Q"), announcing the Company's financial and operating results for the third quarter of 2012. The Company reported net income of $4.51 million, or $1.70 per diluted share, on revenue of $113.79 million, compared to net income of $3.4 million, or $2.10 per diluted share, on revenue of $108.98 million for the same period the prior year. The Q3 2012 10-Q stated, in pertinent part:

> *The Company's primary offering to retail customers is what is referred to as agency execution or an agency model. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits or losses.* Under the agency model, when a customer executes a trade on the price quotation presented by the FX market maker, *the Company acts as a credit intermediary, or a riskless principal*, simultaneously entering into a trade with the customer and the FX market maker.

50. The Q3 2012 10-Q was signed by defendants Niv and Lande and contained certifications pursuant to SOX by defendants Niv and Lande, which stated that the financial information contained in the Q3 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

51. On March 18, 2013, the Company filed its annual report on Form 10-K with the

SEC ("2012 10-K"), announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012. The 2012 10-K stated, in pertinent part:

> *We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks.* In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions.

52.     The 2012 10-K was signed by the Director Defendants and contained certifications pursuant to SOX by defendants Niv and Lande, which stated that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

53.     On May 10, 2013, the Company filed its quarterly report on Form 10-Q with the SEC ("Q1 2013 10-Q"), announcing the Company's financial and operating results for the first quarter of 2013. The Company reported net income of $6.86 million, or $2.30 per diluted share, on revenue of $122.05 million, compared to net income of $2.89 million, or $1.60 per diluted share, on revenue of $102.32 million for the same period the prior year. The Q1 2013 10-Q stated, in pertinent part:

> We currently have limited exposure to currency risk from customer open positions as *we utilize an agency model*, simultaneously entering offsetting trades with both our customers and FX market makers.

54.     The Q1 2013 10-Q was signed by defendants Niv and Lande and contained certifications pursuant to SOX by defendants Niv and Lande, which stated that the financial information contained in the Q1 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.