internal control over financial reporting.

77.     On May 6, 2016, the Company filed its quarterly report on Form 10-Q with the SEC ("Q1 2016 10-Q"), announcing the Company's financial and operating results for the first quarter of 2016. The Company reported net income of $49.74 million, or $8.88 per diluted share, on revenue of $71.52 million, compared to net loss of $426.82 million, or $90.56 per diluted share, on revenue of $215.19 million for the same period the prior year. The Q1 2016 10-Q stated, in pertinent part:

> We currently have limited exposure to currency risk from customer open positions as *we utilize an agency model*, simultaneously entering offsetting trades with both our customers and FX market makers.

78.     The Q1 2016 10-Q was signed by defendants Niv and Lande and contained certifications pursuant to SOX by defendants Niv and Lande, which stated that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

79.     On August 5, 2016, the Company filed its quarterly report on Form 10-Q with the SEC ("Q2 2016 10-Q"), announcing the Company's financial and operating results for the second quarter of 2016. The Company reported net income of $60.40 million, or $10.78 per diluted share, on revenue of $70.56 million, compared to net loss of $95.81 million, or $19.70 per diluted share, on revenue of $16.22 million for the same period the prior year. The Q2 2016 10-Q stated, in pertinent part:

> We currently have limited exposure to currency risk from customer open positions as *we utilize an agency model*, simultaneously entering offsetting trades with both our customers and FX market makers.

80.     The Q2 2016 10-Q was signed by defendants Niv and Lande and contained certifications pursuant to SOX by defendants Niv and Lande, which stated that the financial

information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

81.     On November 8, 2016, the Company filed its quarterly report on Form 10-Q with the SEC ("Q3 2016 10-Q"), announcing the Company's financial and operating results for the third quarter of 2016.  The Company reported a net loss of $39.13 million, or $6.98 per diluted share, on revenue of $41.92 million, compared to net income of $73.65 million, or $13.86 per diluted share, on revenue of $30.61 million for the same period the prior year.  The Q3 2016 10-Q stated, in pertinent part:

> We currently have limited exposure to currency risk from customer open positions as *we utilize an agency model*, simultaneously entering offsetting trades with both our customers and FX market makers.

82.     The Q3 2016 10-Q was signed by defendants Niv and Lande and contained certifications pursuant to SOX by defendants Niv and Lande, which stated that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

83.     The statements described above were false and misleading and/or omitted material information because defendants failed to disclose that: (i) between September 4, 2009 through at least 2014, the Company's U.S. Subsidiary, FXCM LLC, engaged in false and misleading solicitations of the Company's retail foreign exchange customers by concealing its relationship with its most important market maker and by misrepresenting that Global Brokerage's "no dealing desk" platform had no conflicts of interest with its customers; (ii) FXCM LLC made false statements to the NFA about its relationship with the market maker; and (iii) the Company therefore misled investors regarding its adverse position to its retail customers; and (iv) as a result of the foregoing, the Company's statements were material false and/or misleading.

**Defendants Cause the Company to Issue Materially False and Misleading
Statements and/or Omit Material Information in the Company's Proxy Statements**

84.     On April 30, 2012, the Company filed its proxy statement on Form DEF 14A with

the SEC for the 2012 annual shareholders meeting (the "2012 Proxy").  In particular, the 2012

Proxy states that the Company's "only material asset is a controlling interest in FXCM Holdings

LLC…"  This statement is false because in fact, the Company had a significant interest in Effex

Capital through the March 1, 2010 services agreement, and subsequent May 1, 2010 agreement,

where Effex Capital made monthly payments to the Company in the amount of $21 per million

dollars of trading volume executed by Effex Capital, resulting in approximately $77 million being

rebated to the Company from 2009 to 2014.  Further, this undisclosed relationship caused the

Company to take positions adverse to its retail customers.

85.     The 2012 Proxy also asked shareholders to approve, in a non-binding advisory vote,

the compensation of the Company's named executive officers, which was based, in part, on

incentive and performance-based awards.  The omissions described above rendered the 2012 Proxy

false and misleading because the true performance of the Company was not revealed since the

Company's relationship with Effex Capital was not disclosed, rendering the performance based

awards to the Company's officers based on untrue statements.

86.     On April 30, 2013, the Company filed its proxy statement on Form DEF 14A with

the SEC for the 2013 annual shareholders meeting (the "2013 Proxy").  Again, the 2013 Proxy

stated that the Company's "only material asset is a controlling interest in FXCM Holdings LLC…"

This statement is false because in fact, the Company had a significant interest in Effex Capital

through the March 1, 2010 services agreement, and subsequent May 1, 2010 agreement, where

Effex Capital made monthly payments to the Company in the amount of $21 per million dollars

of trading volume executed by Effex Capital, resulting in approximately $77 million being rebated

to the Company from 2009 to 2014. Further, this undisclosed relationship caused the Company to take positions adverse to its retail customers.

87.     The 2013 Proxy also asked shareholders to approve, in a non-binding advisory vote, the compensation of the Company's named executive officers, which was based, in part, on incentive and performance-based awards. The omissions described above rendered the 2013 Proxy false and misleading because the true performance of the Company was not revealed since the Company's relationship with Effex Capital was not disclosed, rendering the performance based awards to the Company's officers based on untrue statements.

88.     On April 30, 2014, the Company filed its proxy statement on Form DEF 14A with the SEC for the 2014 annual shareholders meeting (the "2014 Proxy"). The 2014 Proxy also stated that the Company's "only material asset is a controlling interest in FXCM Holdings, LLC…" This statement is false because in fact, the Company had a significant interest in Effex Capital through the March 1, 2010 services agreement, and subsequent May 1, 2010 agreement, where Effex Capital made monthly payments to the Company in the amount of $21 per million dollars of trading volume executed by Effex Capital, resulting in approximately $77 million being rebated to the Company from 2009 to 2014. Further, this undisclosed relationship caused the Company to take positions adverse to its retail customers.

89.     The 2014 Proxy also asked shareholders to approve, in a non-binding advisory vote, the compensation of the Company's named executive officers, which was based, in part, on incentive and performance-based awards. The omissions described above rendered the 2014 Proxy false and misleading because the true performance of the Company was not revealed since the Company's relationship with Effex Capital was not disclosed, rendering the performance based awards to the Company's officers based on untrue statements.

90.     On May 1, 2015, the Company filed its proxy statement on Form DEF 14A with the SEC for the 2015 annual shareholders meeting (the "2015 Proxy"). The 2015 Proxy stated that the Company's "only material asset is a controlling interest in FXCM Holdings, LLC…" This statement is false because in fact, the Company had a significant interest in Effex Capital through the March 1, 2010 services agreement, and subsequent May 1, 2010 agreement, where Effex Capital made monthly payments to the Company in the amount of $21 per million dollars of trading volume executed by Effex Capital, resulting in approximately $77 million being rebated to the Company from 2009 to 2014. Further, this undisclosed relationship caused the Company to take positions adverse to its retail customers.

91.     The 2015 Proxy also asked shareholders to approve, in a non-binding advisory vote, the compensation of the Company's named executive officers, which was based, in part, on incentive and performance-based awards. The omissions described above rendered the 2015 Proxy false and misleading because the true performance of the Company was not revealed since the Company's relationship with Effex Capital was not disclosed, rendering the performance based awards to the Company's officers based on untrue statements.

92.     On April 26, 2016, the Company filed its proxy statement on Form DEF 14A with the SEC for the 2016 annual shareholders meeting (the "2016 Proxy," collectively with the 2012-2016 Proxies, the "2012-2016 Proxy Statements"). The 2016 Proxy stated that the Company's "only material asset is a controlling interest in FXCM Holdings, LLC…" This statement is false because in fact, the Company had a significant interest in Effex Capital through the March 1, 2010 services agreement, and subsequent May 1, 2010 agreement, where Effex Capital made monthly payments to the Company in the amount of $21 per million dollars of trading volume executed by Effex Capital, resulting in approximately $77 million being rebated to the Company from 2009 to

2014. Further, this undisclosed relationship caused the Company to take positions adverse to its retail customers.

93.     The 2016 Proxy also asked shareholders to approve, in a non-binding advisory vote, the compensation of the Company's named executive officers, which was based, in part, on incentive and performance-based awards. The omissions described above rendered the 2016 Proxy false and misleading because the true performance of the Company was not revealed since the Company's relationship with Effex Capital was not disclosed, rendering the performance based awards to the Company's officers based on untrue statements.

94.     The 2012-2016 Proxy Statements omitted material information concerning, among other things, that: (i) despite representing that the Company was operating under a "no dealing desk" platform, the Company was taking positions adverse to those of its customers; (ii) that the Company had a relationship with its most important market maker that "won" the majority of customers' orders; and (iii) customers' profits or losses were tied to the Company's bottom line because the Company was not only acting as a credit intermediary, as it represented, but instead was a market maker. Further, in the sections of the 2012-2016 Proxy Statements entitled "Certain Relationships and Related Person Transactions," the Company continuously failed to disclose its relationship with Effex Capital and Dittami, the market maker that rebated approximately $77 million to the Company between 2009 and 2014.

### The Truth Emerges

95.     On February 6, 2017, the CFTC issued an order finding that FXCM LLC engaged in false and misleading solicitations of FXCM LLC's retail foreign exchange customers (the "CTFC Order").[16]  The CTFC Order stated, in pertinent part:

---

[16] *Available at* http://www.cftc.gov/PressRoom/PressReleases/pr7528-17.