**Washington, DC** – The U.S. Commodity Futures Trading Commission (CFTC) today issued an Order filing and settling charges against **Forex Capital Markets, LLC** (FXCM), its parent company, **FXCM Holdings, LLC** (FXCM Holdings), and two founding partners, **Dror ("Drew") Niv**, and **William Ahdout**, who were, respectively, Chief Executive Officer of FXCM and Managing Director of FXCM, (collectively, Respondents). FXCM's principal place of business is New York, New York; Niv resides in Connecticut; and Ahdout resides in New York.

*The CFTC Order finds that, between September 4, 2009 though at least 2014 (the Relevant Period), FXCM engaged in false and misleading solicitations of FXCM's retail foreign exchange (forex) customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk" platform had no conflicts of interest with its customers. The Order finds FXCM, FXCM Holdings, and Niv responsible for FXCM making false statements to the National Futures Association (NFA) about its relationship with the market maker.*

*The Order requires Respondents jointly and severally to pay a $7 million civil monetary penalty and to cease and desist from further violations of the Commodity Exchange Act and CFTC Regulations, as charged. FXCM, Niv, and Ahdout agree to withdraw from CFTC registration; never to seek to register with the CFTC; and never to act in any capacity requiring registration or exemption from registration, or act as a principal, agent, officer, or employee of any person that is registered, required to be registered, or exempted from registration with the CFTC.*

**"The CFTC Is Committed to Protecting Customers from Harm in the Markets It Regulates"**

"Full and truthful disclosure to customers and honest discourse with self-regulatory organizations such as NFA are vital to the integrity and oversight of our markets," said Gretchen L. Lowe, Principal Deputy Director and Chief Counsel of the CFTC's Division of Enforcement. "Today's action's demonstrates that the CFTC is committed to protecting customers from harm in the markets it regulates."

FXCM is registered with the CFTC as a Futures Commission Merchant and Retail Foreign Exchange Dealer. FXCM has been providing retail customers with access to over-the-counter forex markets through a proprietary technology platform and has acted as counterparty in transactions with its retail customers in which customers can buy one currency and simultaneously sell another. Both Niv and Ahdout were CFTC registrants during the relevant period.

FXCM, under Niv's and Ahdout's direction and control, misrepresented to its retail forex customers that when they traded forex on FXCM's No Dealing Desk platform, FXCM would have no conflict of interest, the Order finds. In addition, according to FXCM's marketing campaign, retail customers' profits or losses

would have no impact on FXCM's bottom line, because FXCM's role in the customers' trades was merely that of a credit intermediary, the Order finds. FXCM further represented that the risk would be borne by banks and other independent "market makers" that provided liquidity to the platform, according to the Order.

### FXCM's Undisclosed Interest

*Contrary to these representations, the Order finds, FXCM had an undisclosed interest in the market maker that consistently "won" the largest share of FXCM's trading volume – and thus was taking positions opposite FXCM's retail customers.* FXCM, the Order finds, formulated a plan in 2009 to create an algorithmic trading system, using an FXCM computer program that could make markets to FXCM's customers, and thereby either replace or compete with the independent market makers on FXCM's "No Dealing Desk" platform. Although FXCM eventually spun off the algorithmic trading system as a new company, in actuality the company remained closely aligned with FXCM, according to the Order. This market maker received special trading privileges, benefitted from a nointerest loan provided by FXCM, worked out of FXCM's offices, and used FXCM employees to conduct its business, the Order further finds.

The Order finds that FXCM and the market maker agreed that the market maker would rebate to FXCM approximately 70 percent of its revenue from trading on FXCM's retail forex platform. In total, through monthly payments from 2010 through 2014, the company rebated to FXCM approximately $77 million of the revenue it achieved. However, FXCM did not disclose to customers, among other things, that this company – FXCM's principal market maker – was a startup firm spun off from FXCM, the Order further finds.

### False Statements to the NFA

*The Order also finds that FXCM willfully made false statements to NFA in order to conceal FXCM's role in the creation of its principal market maker as well as the fact that the market maker's owner had been an FXCM employee and managing director. The Order finds that during a meeting between NFA compliance staff and FXCM executives, Niv omitted to mention to NFA the details of FXCM's relationship with the market maker.*

The Order holds Niv and Ahdout liable for FXCM's fraud violations as "controlling persons" who were responsible, directly or indirectly, for FXCM's violations. Niv is also held liable for FXCM's false statements to NFA as a controlling person who was responsible directly or indirectly for those violations. FXCM Holdings is held liable for FXCM's fraud and false statement violations as principal of FXCM, the Order also finds.

96. Also on February 6, 2017, in connection with the CFTC Order, the Company issued a press release entitled, "FXCM US Reaches Settlement with NFA and CFTC." The press release announced, among other things, that the Company would exit the U.S. market and pay a $7 million fine, and stated, in pertinent part:

> NEW YORK, February 6, 2017-- FXCM Inc. (NASDAQ:FXCM) ("FXCM") today announced simultaneous regulatory settlements with the National Futures Association ("NFA") and the Commodity Futures Trading Commission ("CFTC") against its U.S. subsidiary, Forex Capital Markets LLC and certain of its principals. FXCM Holdings, LLC was also named in the CFTC settlement. The named FXCM entities and principals neither admit nor deny the allegations associated with the settlements. The NFA settlement has no monetary fine, and the CFTC settlement has a $7 million fine.
>
> FXCM will be withdrawing from business in the U.S. and has signed a non-binding letter of intent with GAIN Capital Holdings, Inc. ("GAIN") under which GAIN would purchase FXCM's U.S. customer accounts. The transaction is subject to regulatory approval and a definitive agreement. FXCM and GAIN are working to determine the timing for the account transfer and expect to provide further information in that regard in the coming days. In 2016, FXCM's U.S. business had unaudited net revenues of approximately $48 million and generated an EBITDA loss, but the costs associated with the business will not be transferring to GAIN. There will be no changes to FXCM customers outside of the United States.
>
> Withdrawing from this business will free approximately $52 million in capital. Proceeds from the account sale and the release of capital will go toward the further repaying of FXCM's loan from Leucadia National Corporation.
>
> FXCM will for the interim period continue to service its U.S. customers and to provide top quality trade execution pending the customer-account sale and business withdrawal. FXCM will also be working diligently to be sure that an account transition to GAIN's retail brand, FOREX.com, will be orderly, expeditious and seamless. FXCM wants to express its most sincere thanks to those U.S. customers who have been with FXCM over the years and wish you all the best of luck following this transition.
>
> FXCM wants to stress that these settlements have no impact on any customer of FXCM's global businesses. FXCM and its global subsidiaries will continue to provide excellent execution and competitive pricing to its customers overseas through its award-winning technology, customer service and trading tools.

97. On this news, the Company's stock price plummeted from a closing price of $6.85 on February 6, 2017, to close at $3.45 on February 7, 2017, a loss of $3.40 per share, or approximately 50%, on unusually heavy volume of 1,980,000 shares.

98. On February 21, 2017, the Company announced that defendants Ahdout and Niv submitted their resignations to the Company from their positions as members of the Board, effective immediately. Defendant Niv also informed the Company of his intention to resign as CEO to be effective upon the selection and appointment of a successor.

99. The Company wasted no time in appointing a successor to defendant Niv for the role of CEO. On the same day as defendant Niv announced his resignation, February 21, 2017, the Company announced that Brendan Callan was appointed to the role of interim CEO to replace defendant Niv.

100. As a result of defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's securities, the Company and its shareholders have suffered significant losses and damages.

**DAMAGES TO THE COMPANY**

101. Global Brokerage has been, and will continue to be, severely damaged and injured by the defendants' misconduct. As a direct and proximate result of the defendants' conduct, Global Brokerage has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

    a. costs incurred in compensation and benefits paid to defendants that violated federal securities laws;

    b. costs incurred defending against SEC, DOJ, CFTC and other government investigations and litigation;

    c. substantial loss of market capital;

    d. costs already incurred and to be incurred defending the pending securities fraud class action lawsuits pending before this Court captioned *Khoury v. FXCM Inc.*, 1:17-cv-916-RA, *Zhao v. FXCM Inc., et al.*, 1:17-cv-955-UA and *Blinn v. FXCM Inc., et al.*, 1:17-cv-1028-RA (collectively, the "Securities Class Actions"); and

    e. any fines or other liability resulting from the Company's violations of federal law.

102. In addition, Global Brokerage's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired. The credibility and motives of management are now in serious doubt.

103. The wrongdoing complained of herein has irreparably damaged Global Brokerage's corporate image and goodwill. For at least the foreseeable future, Global Brokerage will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Global Brokerage's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

104. Plaintiff brings this action derivatively in the right and for the benefit of Global Brokerage to redress injuries suffered, and to be suffered, by Global Brokerage as a direct result of violations of federal securities laws by the Director Defendants. Global Brokerage is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

105. The Board of Global Brokerage, at the time this action was commenced, consisted

of the following nine individuals: Sakhai, Brown, Davis, Grossman, Gruen, LeGoff, Reyhani, Silverman and Yusupov.

106.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Global Brokerage Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

### Demand is Futile as to Defendant Sakhai Because His Principal Professional Occupation is as the Company's Chief Operating Officer

107.    Defendant Sakhai is one of the founders of the Company, and has been the Chief Operating Officer ("COO") since 1999 and a director since 2010. In his role as COO of the Company for the fiscal years 2015, 2014 and 2013, Defendant Sakhai received $2,102,548, $821,323, and $1,481,556 in total compensation, respectively. The Company does not claim that Defendant Sakhai is an independent director and because Defendant Sakhai's primary source of income and primary employment is his employment as COO of Global Brokerage and his professional reputation is inextricably bound to his role at Global Brokerage, Defendant Sakhai is incapable of acting independently and demand is futile upon him.

108.    Further, defendant Sakhai is not independent because of his familial relationship with defendant Ahdout as the two are cousins. As such, demand upon defendant Sakhai is futile

### Demand is Futile as to Defendant Yusupov Because His Principal Professional Occupation is as the Company's Global Head of Dealing

109.    Defendant Yusupov is one of the founders of the Company, has been a director since 2010 and has been the Global Head of Dealing and a Managing Director since 1999. In his role as Global Head of Dealing of the Company for the fiscal years 2015, 2014 and 2013,